**FRANKLIN & PROKOPIK**
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

**The B & O Building**
**Two North Charles Street, Suite 600**
**Baltimore, Maryland 21201-3732**
**410-752-8700**
**Facsimile 410-752-6868**
**www.fandpnet.com**

**32 S. Washington Street**
**Easton, Maryland 21601**
**410-820-0600**
**Facsimile 410-820-0300**

**1101 Opal Court**
**Hub Plaza, Second Floor**
**Hagerstown, Maryland 21740**
**301-745-3900**
**Facsimile 301-766-4676**

**2325 Dulles Corner Blvd., Suite 1150**
**Herndon, Virginia 20171**
**703-793-1800**
**Facsimile 703-793-0298**

**Tamara B. Goorevitz**
Direct Dial 410-230-3625
tgoorevitz@FandPnet.com

June 20, 2006

Christian C. Mester, Esquire
Janet, Jenner & Suggs LLC
Woodholme Center
1829 Reisterstown Road, Suite 320
Baltimore, MD 21208

Re: Jane Doe v. Logisticare Solution, LLC, et al.
Case No.: 02-0009344

Dear Mr. Mester:

In follow up to our recent conversation regarding the dismissal of MV Public Transportation, Inc. in the above-referenced matter, I have attached an additional Affidavit of Robert Hargis addressing your concerns regarding Logisticare, LLC. I have also attached a Transportation Services Agreement between MV Transportation, Inc. and Logisticare Solutions, LLC. This Agreement was effective November 17, 2005 through January 15, 2006. Although this Agreement is not relevant to the instant action, it explains why Mr. Hargis struck the line in his Affidavit stating that MV Transportation, Inc. and MV Public Transportation, Inc. had no relationship with Logisticare Solutions, LLC. In addition, I refer you to both WMATA's and Logisticare's Answer to Complaint, ¶¶ 4 and 6. Both entities have admitted that Logisticare is not associated with MV Public Transportation. Further, Logisticare denies that MV Public Transportation is its successor in interest.

In accordance with our discussion, I expect that you will now be able to voluntarily dismiss MV Public Transportation, Inc. as a Defendant. Please let me know immediately whether you will agree to the dismissal.

EXHIBIT
tabbies
2

# FRANKLIN & PROKOPIK



Additionally, you previously agreed that you would grant MV Public Transportation additional time to file a responsive pleading while this issue is being resolved. I would like to file a stipulation in that regard. I have enclosed a draft stipulation and would appreciate your consent to the same, in the event that we cannot file a Stipulation of Dismissal right away. I have also enclosed a Praecipe of Entry of Appearance on behalf of MV Public Transportation, Inc.

Thank you for your kind attention to these matters. I look forward to hearing from you.

Very truly yours,

Tamara B. Goorevitz

TBG:mkg

Enclosures

cc: Daniel L. Shea, Esquire (w/enclosures)
Brault Graham, LLC
101 South Washington Street
Rockville, MD 20850

Terance J. O'Connell, Esquire (w/enclosures)
401 East Jefferson Street, Suite 204
Rockville, MD 20850

Michael A. DeSantis, Esquire (w/enclosures)
Hartel, Kane, DeSantis, MacDonald & Howie, LLP
6301 Ivy Lane, Suite 800
Greenbelt, MD 20770

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

JANE DOE by her Guardian of the Person and Property KATHLEEN MITCHELL *

Plaintiff * Civil Action No.:

v. *

LOGISTICARE SOLUTIONS, LLC, et al *

Defendant *

* * * * * * * * * * * *

**AFFIDAVIT OF ROBERT HARGIS**

1. I, Robert Hargis, certify that I am over the age of eighteen (18) and competent to testify as to the matter set forth herein.

2. I am the Executive Vice President of MV Transportation, Inc., located at 2024 College Street, Elk Horn, IA 51531. MV Transportation, Inc. is the parent company of MV Public Transportation, Inc.

3. MV Transportation, Inc. and MV Public Transportation, Inc. (incorrectly named in Complaint as MV Public Transportation, Inc. d/b/a MV Transport as successor in interest to Logisticare Solutions, LLC d/b/a MetroAccess Paratransit d/b/a METROACCESS), ~~have no relationship with~~ RH RH ~~Defendant Logisticare Solutions, LLC and~~ had no relationship with Defendant Logisticare Solutions, LLC on May 26, 2005.

4. Neither MV Transportation, Inc. nor MV Public Transportation, Inc. assumed any of the assets or liabilities of any of the previous contractors, including Logisticare, LLC.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true.

Date: 6/13/06

Robert Hargis
Robert Hargis

# LOGISTICARE SOLUTIONS, LLC.
# TRANSPORTATION SERVICES AGREEMENT

OPERATOR: "MV TRANSPORTATION, INC. ("MV")

This Transportation Services Agreement (the "Agreement") is made as of the 17 day of November 2005. Effective Date" (as hereinafter defined), between LogistiCare Solutions, LLC ("LogistiCare") and "MV Transportation, Inc. ("MV:") the transportation provider (the "Operator"), which parties are each more particularly identified on the signature page hereof and are sometimes herein called individually the "Party" and together the "Parties".

LogistiCare arranges for transportation and related services, including the services described in Exhibit A to this Agreement (the "Services"), pursuant to contracts with various organizations (the "Organizations") responsible for furnishing healthcare, human service programs, or transportation or for funding healthcare, human service programs, or transportation for, individuals (the "Beneficiaries") who are entitled to receive Services under programs operated or funded by the Organizations. LogistiCare may from time to time request Operator to furnish Services and, upon such request, Operator shall furnish Services, on the terms and conditions of this Agreement, as follows:

(1) Certain Definitions.

(a) "Effective Date" means the date appearing on the signature page of this Agreement.

(b) "Practices and Procedures" means all administrative and operating activities, conduct, practices, records, reports and documents required by this Agreement or applicable law, rule or regulation to be performed, prepared, maintained or delivered by Operator, in connection with requests, billing and payment for, and furnishing of, Services, including (but not limited to) those which are set forth in Exhibits A & B hereto and, if indicated, supplemental requirements applicable to Operator for Services performed pursuant to LogistiCare's contracts with identified Organizations.

(c) "Operator Qualifications" means all credentials, certifications, licenses, personnel, equipment, facilities, training programs, insurance coverage and other requirements as are necessary or appropriate to enable Operator to furnish the Services in compliance with applicable legal, regulatory and industry standards, including (but not limited to) those which are described in Exhibits A & B hereto and, if indicated, supplemental requirements applicable to Operator pursuant to LogistiCare's contracts with identified Organizations.

(d) "Service Order" means LogistiCare's communication to Operator specifying the Services to be furnished by Operator in connection with a "Trip."

(e) "Trip" means all of the Services to be furnished by Operator for a Beneficiary pursuant to a Service Order.

(2) Requests for and Performance of Services

(a) During the term of this Agreement, LogistiCare may from time to time request Operator to furnish Services for a Beneficiary, by LogistiCare's placing a Service Order for a Trip. LogistiCare shall assign a Trip authorization number to each Service Order at the time it is communicated to Operator, which number the Parties shall use when referring to that Service Order and the related Trip.

(b) Upon receipt of a Service Order, Operator shall furnish the Services in accordance with such Service Order and at the price or rate applicable to the specified Services according to Exhibit B hereto.

(c) Nothing in this Agreement shall *(i)* require LogistiCare to place any particular Service Order with Operator, (ii) prohibit or restrict LogistiCare from ordering Services from other Operators, *(iii)* prevent LogistiCare from withdrawing a Service Order that has been placed with Operator.

(3) Representations and Covenants of Operator

(a) Operator represents that it now (i) possesses, and at all times during the term of this Agreement will possess, the Operator Qualifications; (ii) complies, and at all times during the term of this Agreement will comply, with the Practices and Procedures; and (iii) operates, and at all times during the term of this Agreement will operate, its business in accordance with the provisions of all applicable laws, rules and regulations applying.

(b) At LogistiCare's request, Operator will confirm in writing, to LogistiCare or any person named by LogistiCare, that Operator is operating its business in accordance with the provisions of this Agreement. Operator will immediately advise LogistiCare in writing if at any time Operator is not operating its business in accordance with the provisions of this Agreement.

(c) Operator shall furnish all Services in connection with each Trip competently and in a timely, courteous and professional manner and in all other respects as required by the Practices and Procedures. Unless LogistiCare shall approve in the related Service Order, Operator will utilize only its employees who have the appropriate training, skills and credentials to perform the Services required by that Service Order.

(d) Operator shall furnish only the Services specified in the Service Order with respect to the related Trip, unless in the best professional judgment of Operator additional or other services are required to attend to the medical needs of the Beneficiary. Operator shall be entitled to charge for additional and other services if Operator obtains the approval of LogistiCare therefore, which approval when given shall be deemed to amend the related Service Order.

(e) Operator shall (i) maintain in full force and effect, and designate LogistiCare and WMATA as additional named insureds on all liability insurance policies referred to in the Operator Qualifications and (ii) furnish LogistiCare with evidence of such named insured status every six months during the term of this Agreement or upon LogistiCare's request therefore.

(f) Operator shall indemnify, protect, and hold LogistiCare and WMATA harmless from and against any and all claims, actions, suits, proceedings, costs, damages, injuries, and/or liabilities of any kind or nature whatsoever arising from or alleged to arise from actions connected with services provided by or at the direction of Operator, including the cost of reasonable attorney fees and other expenses incurred by or assessed against LogistiCare or WMATA. Operator shall operate as an independent Operator in providing services under this Agreement, and not as an agent, representative, or employee of LogistiCare.

(g) If, in connection with furnishing Services, Operator receives possession of personal property belonging to a Beneficiary, Operator shall use its best efforts to safeguard such property and records and shall deliver the same to that Beneficiary or another person assuming responsibility for that Beneficiary when that Beneficiary leaves Operator's care.

(h) Operator will not, without the prior consent of LogistiCare, assign this Agreement or the right to receive any payment hereunder.

(i) Operator shall at all times keep in strict confidence, and not disclose or use for any purpose, any information that is obtained by Operator as a result of entering into, furnishing Services under, or otherwise performing this Agreement, except as is directly necessary for Operator to comply with this Agreement. Operator shall in no way interfere with LogistiCare's contractual relationship with WMA T A.

(k) In addition to the other requirements of this Agreement, Operator shall furnish Services to Beneficiaries of the same quality, availability, accessibility, medical and non-medical propriety and in accordance with the safe standards as Operator furnishes services to its other patients and clients, and shall not discriminate in the Services furnished to Beneficiaries, the basis on which such Services are

furnished, on the basis of race, color, national origin, ancestry, religion, sex, marital status, sexual orientation, age, source of payment or any other prohibited basis.

(4) Billing and Payment for Services

(a) Operator shall submit to LogistiCare a claim for payment, in accordance with the procedures established in Exhibit B.

(b) Operator shall (i) be entitled only to receive payment for the Services at the prices and rates set forth opposite the respective Services on Exhibit B (as such Exhibit may hereafter be amended); (ii) look exclusively to LogistiCare for payment of all amounts payable in connection with the furnishing of Services; and (iii) not in any way seek compensation, surcharge, reimbursement, gratuities or other payment for or in respect of any Services from any Beneficiary or Organization, except in its role as collector of WMATA-determined MetroAccess passenger fares. If Operator receives from a Beneficiary any payment that is not required to be made under that Beneficiary's contract or by the state agencies responsible for furnishing the related program, Operator (A) shall immediately refund the full amount of such payment and (B) authorizes LogistiCare to offset such amount from any monies due to Operator, if such payment is not so refunded.

(5) Amendment of Agreement

(a) This Agreement may be amended only by a writing signed by both Parties, except that LogistiCare may unilaterally amend the definition of Services, the rate and/or price for Services, the Operator Qualifications and the Practices and Procedures (Exhibits A & B hereto) by notifying Operator of the terms and effective date of such amendment at least 30 days prior to such declared effective date.

(b) Within 5 days after the date of each notice given pursuant to paragraph 5(a) hereof, Operator shall notify LogistiCare that Operator accepts such amendment. If Operator fails to give such notice or refuses to accept such amendment, this Agreement will terminate as of the date such amendment is declared to be effective in LogistiCare's notice.

(6) Duration of Agreement

(a) This Agreement shall be effective as of the Effective Date and shall continue in effect until January 15, 2006 or until such date as LogistiCare stops providing services to WMATA.

(b) This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Parties. The rights and obligations of the Parties that are accrued under this Agreement as of the date of its termination shall survive such termination and be fully enforceable.

(7) General Provisions

(a) Paragraph headings are for convenience only and shall not limit or affect the meaning or interpretation of the text. .

(b) If any dispute shall arise relating to this Agreement or to the furnishing of or the payment for Services pursuant hereto, the Parties shall attempt in good faith to confer for the purpose of resolving such dispute before taking any other action. Both Parties hereby irrevocably waive the right to trial by jury on any matter that relates to this Agreement and is submitted to court for adjudication.

(c) This Agreement (including the Exhibits hereto which are an integral part of this Agreement) supersedes all other agreements and understandings, and shall exclusively govern the relationship, between the Parties (LogistiCare and Operator) with respect to the subject matter hereof.

(d) This Agreement shall be construed and enforced in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.

( e) Nothing in this Agreement is intended to or shall be deemed to create any rights or remedies in favor of Operator against any third party, including Organizations and Beneficiaries.

(f) Any notice, consent, approval or other communication, including Service Orders, required or desired to be given under this Agreement, shall be in writing and effective (i) on the day of receipt if personally delivered, delivered by a nationally recognized messenger service, or by facsimile transmission if

immediately confirmed by mail; or (ii) on the third day after mailing, if sent by postage pre-paid certified mail (return receipt requested). All such notices, consents, approvals and other communications shall be addressed to the Parties at their respective addresses or by facsimile to the Parties at their respective facsimile telephone number, as the same appear after the Party's name below. Such addresses and facsimile telephone numbers may be changed by written notice given in accordance with this paragraph.

(g) If any provision of this Agreement is rendered invalid or unenforceable by any local, state or Federal law, rule or regulation, or is declared invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect.

(h) The failure of any Party at any time to require performance by the other Party of any provision of this Agreement shall not (i) affect the right of such Party to require future performance of that or any other provision or (ii) be construed as a waiver of a continuing or succeeding breach or right under this Agreement. The respective rights and remedies of the Parties are cumulative and may be exercised separately or concurrently.

(i) No party to this Agreement shall under any circumstances be liable to any other party for any loss of profits or economic, special or consequential damages.

(j) The relationship between LogistiCare and Operator under this Agreement is that of independent contractors and not co-venturers or partners. Neither Party nor its employees, agents and representatives shall (i) be deemed to be an employee, agent or representative of the other Party or (ii) have any authority to bind the other Party to any obligation.

The Parties have executed this Agreement as of November 17, 2005 (the "Effective Date").

LogistiCare Solutions, LLC.
1640 Phoenix Blvd., Suite 200
College Park, GA 30349
Facsimile Number: 770-907-7598

By: [signature]

Albert Contura: ECC 11/17/05
Printed Name & Title

MV TRANSPORTATION, INC.

By: [signature]

John Monson CEO
Printed Name & Title

**Exhibit A – Service Guidelines**
**Dedicated Vehicle Service**
**MetroAccess Program – Washington Metropolitan Area Transit Authority**

**A. Definitions**

1. *Dedicated Vehicle* – A dedicated vehicle is a vehicle owned or leased by LogistiCare and provided to the Operator or otherwise provided by the Operator for use exclusively in the WMATA MetroAccess program. If the Operator also operates other LogistiCare-owned vehicles, it shall be the responsibility of LogistiCare to inform the Operator which vehicles are the dedicated vehicles.

**B. Administrative, Reservation Receipt, and General**

1. Operator shall receive trip reservations via fax, modem, or Internet from LogistiCare each day and confirm the receipt thereof in a form acceptable to LogistiCare.
2. Operator shall transport MetroAccess eligibles, companions, and personal care attendants (PCAs) only as specified by the reservations provided by LogistiCare and the terms of this Agreement.
3. Operator shall ensure that all drivers of dedicated vehicles maintain two-way radio contact with LogistiCare dispatchers at all times while performing MetroAccess service. Operator shall normally handle all dispatch functions; however, LogistiCare shall reserve the right to directly dispatch all dedicated vehicles, should it so decide, in its sole discretion.
4. Operator shall operate dedicated vehicles under this Agreement between the hours of 5:30 am and 12:00 am, 365 days per year, with an additional hour of operation on Friday and Saturday night (until 2:00 am), unless otherwise specified in Exhibit B of this agreement or amended by mutual consent of Operator and LogistiCare.
5. Operator shall establish and maintain both a telephone line and fax line for the exclusive use by LogistiCare to contact Operator during all hours of operation. The fax line shall be equipped with a fax machine.
6. Operator, upon consultation with LogistiCare, may refuse to transport any person who, in the judgment of the employees of the Operator, is a threat to the health, safety, or welfare of either Operator's employees or other MetroAccess eligibles, or prevents or inhibits the vehicle from being operated in a safe manner.
7. Operator shall schedule, dispatch and perform all trips as received from LogistiCare, consistent with Operator's coverage area described in Exhibit B (or as amended by mutual agreement of the Operator and LogistiCare) and shall use its total number of in-service dedicated vehicles. LogistiCare reserves the right to review Operator vehicle shift schedules. Operator shall provide timely information on all vehicle pullouts and driver and radio assignments as required by LogistiCare. Operator shall inform LogistiCare of its inability to complete an assignment as soon as Operator or its driver becomes aware of such inability.
8. Operator shall maintain at all times an immediately accessible pool of reserve drivers equal to 10% of drivers scheduled for the day's routes.
9. Operator agrees not to divulge any information concerning any MetroAccess client or employee to any unauthorized person without written consent of the individual employee client, or responsible parent or guardian.

C. **Pick Up and Delivery Standards** - Operator must ensure that transportation services meet the following minimum delivery requirements:

1. Arrival on time for scheduled pick-up shall be standard practice. Arrival up to fifteen (15) minutes before the scheduled pick-up time is permitted; however, a rider shall not be required to board the vehicle before the scheduled pick-up time.
2. MetroAccess eligibles are to be transported to and from appointments on time. A 93% on-time performance rate is required. Any arrival more than 15 minutes after the scheduled pick-up time is not acceptable as timely service.
3. Operator shall inform LogistiCare as soon as Operator or driver becomes aware of any pickup that will be more than 15 minutes late.
4. The Operator's drivers must wait ten (10) minutes after the appointed pick up time before a passenger can be considered a no-show. Operator's driver is not required to wait more than ten (10) minutes, if Operator's driver arrives on or after the scheduled pick up time.
5. Operator must notify LOGISTICARE by entering notes in Emtrack, by radio, or by fax before allowing drivers to no-show any rider. If there is no time stamped documentation to verify the no-show, the Operator will be responsible for returning to pickup the rider within 1 hour.
6. In shared ride situations, no trip shall take longer than one and a half (1.5) times the duration of the same trip taken on an exclusive ride basis.

D. **General Vehicle Requirements**

1. All dedicated vehicles provided by LogistiCare and operated by Operator under this Agreement will remain at all times the property of LogistiCare. Operator shall relinquish physical control of any dedicated vehicle immediately upon request by LogistiCare.
2. All vehicles assigned by LogistiCare to Operator will be garaged at Operator facilities, unless otherwise required by LogistiCare. LogistiCare reserves the right to approve the location of Operator garage facilities.
3. LogistiCare in its sole discretion will determine which and how many of its vehicles will be operated by Operator and garaged as spares at Operator facilities.
4. Operator shall assume complete responsibility for maintenance, insurance, security, and functioning of the dedicated vehicles, as well as all equipment, supplies, signage, etc. contained within or attached to the vehicles, unless otherwise specified by LogistiCare.
5. Operator must ensure that all vehicles are in good working order and, as to vehicles provided by LogistiCare, that the vehicles are without deferred maintenance issues when returned to LogistiCare or transferred, at LogistiCare's request, to another carrier. LogistiCare reserves the right to perform any needed maintenance at these times and deduct maintenance expenses from funds otherwise owed to Operator.

E. **Vehicle Maintenance Requirements** - Operator shall perform regular preventive maintenance as specified below and shall maintain complete maintenance records. The Operator shall coordinate with LogistiCare personnel and deliver dedicated vehicles to designated locations for regular inspection at WMATA facilities. Expected inspection schedule is quarterly, but LogistiCare and WMATA reserve the right to make more frequent inspections. LogistiCare reserves the right to approve Operator maintenance facilities and maintenance subcontractors. LogistiCare reserves the right to perform neglected maintenance and cleaning activities for dedicated vehicles provided by LogistiCare, and to deduct the cost of such maintenance activities from Operator payments. Operator shall maintain vehicles at all times in safe working order and shall immediately remove any vehicle from service that is unsafe, that fails to meet WMATA vehicle standards, that has unsightly body damage, or that in any other way is deemed by LogistiCare to be unfit for MetroAccess service. Operator shall perform all

needed repairs in a timely manner to ensure that 90% of dedicated vehicles are in-service at all times.

1. Preventive Maintenance Procedures:
   a. All dedicated vans and sedans will be scheduled for inspection and maintenance every 3,000 miles or one month, whichever occurs first.
   b. When bringing the vehicle into the shop, check vehicle interior gauges, seats, flooring, grab rails, privacy panels, window cranks, vents function properly, door handles and buttons, pedal pads, dash lights, cleanliness of interior, a/c operations, heater and defroster windshield wiper /washers and seat belts and wheelchair restraints and seat belts for wheelchair passengers.
   c. Inspect exterior for body damage, cracked glass, D.C. or State Inspection, current tags, non-expiring decals, legible/valid registration card, cracked or broken lenses; inspect windshield wipers and arms, wheels, mirrors, outside door handles, door lock operation, and all lights.
   d. Change engine oil and oil filter(s).
   e. Check and inspect front and rear suspension ball joints, tie rods, idler arms, springs, shocks, all bushings, sway bars.
   f. Lubricate chassis, (door hinges, hood hinges) inclusive of all grease fittings; chassis, body, lift gates, and any special mounted equipment. Silicone lube all chassis mounts, bushings and grommets: lube fuel system linkage, transmission shift linkage, clutch linkage, transfer case shift linkage, parking brake cable guides, and parking brake cables; lube tailgate pivot and latches.
   g. Lube manifold heat riser valve.
   h. Inspect all fuel and brake lines for signs of leaking of chafing; emergency brake cables for crimping and chafing.
   i. Check undercarriage for leakage: engine mounts, transmission fluid, power steering fluid, differential fluid, and antifreeze.
   j. Check drive shafts, U-joints, engine mounts, transmission mounts, and exhaust system.
   k. Brakes - remove wheels, and inspect brake shoes, brake pads, wheel cylinder, calipers, brake drums, and rotor, grease seals, emergency brake hardware operation, adjust all wheels and emergency brake. Where applicable, remove inspection plates and inspect brakes. If brakes have been relined in the last 12,000 miles, it will not be necessary to pull wheels, unless there is a compliant. Inspect wheel brake sensors for wire damage. Brakes will be relined by axles. Shoes or pads will be replaced on both sides. When necessary to replace, calipers or wheel cylinder, use complete rebuild assembly. Drums or rotors turned, cutting off minimum amount of metal to obtain maximum life. Front wheel bearings will be cleaned and repacked when replacing front brakes. Use specified wheel-bearing grease only. Always replace grease seals.
   l. Tires - Rotate tires (if applicable), check air pressure, wear pattern; if excessively low air pressure, check for leaks and repair; replace tires according to Department of Transportation regulations. Front tires replaced at 4/32" rear tires replaced at 2/32"; wear bars are set at 4/32".
   m. Check and fill all fluid levels; engine oil, transmission fluid, transfer case, front differential (4 x 4), differential oil, hydraulic fluid (PTO systems) and any and all types of gear boxes; anti-freeze, windshield washer solvent, battery water, brake fluid, power steering fluid.
   n. Pressure test cooling system -- leave pressure on for a minimum of two (2) minutes

(amount of pressure to be applied according to radiator cap); tighten clamps, replace parts as needed; check hoses for hardness. Inspect all belts for cracks, frays, wear and looseness, tighten where needed.

o. Inspect air filter and breather element, replace as needed; check PCV valve operation, replace as needed.
p. Check all vacuum hoses for proper hookup, cracks, chafing, decay or collapse.
q. Inspect thermostatically controlled air cleaner, hoses, ducts and proper operations.
r. Diesel Engines - Follow procedures outlined above, where applicable, in addition to the following:
   i. Drain water from bottom of fuel tank and fuel separator.
   ii. Check fuel tank mounting brackets.
   iii. Inspect fuel clamps, seals and crossover lines (external).
   iv. Inspect suction and return fuel lines for leaks.
   v. Check for leaks as previously outlined.
   vi. Turbocharger - check intake and exhaust duct work; check oil inlet and check air cleaner restriction gauge; replace as needed.
   vii. Check air inlet hoses and clamps.
   viii. Inspect air compressor filter and clean or replace.
   ix. Four (4) to six (6) drops of engine oil in starter oiling cups.
   x. Check/service air dryer as needed; determined by observing what is drained from air tanks.
   xi. Tune-up on diesel engines will be conducted when performance of vehicle is questioned, excessive smoke or at supervisor's discretion.
s. Batteries - check and fill, clean battery terminals, load test batteries. Minimum voltage 9.6.
t. Check charging system. Voltage at battery minimum 13.8, maximum 15.5 volts.
u. Check and inspect entire unit on all lift gates.
   i. Equipment mounting bolts
   ii. Inspect structural members for cracks, bends, and unsatisfactory welds
   iii. Cables for frayed and correct cable clamps.
   iv. Hydraulic system for leaks and operation All safety related items
   v. Lubricate
   vi. Any cable or chain adjustments
   vii. Check operation of controls
   viii. Hydraulic lines for wear and deterioration

   In addition to all items listed above, the manufacturers' maintenance checklist is to be followed as outlined in manufactures' maintenance/service manual.
v. Wheelchair Lift Equipped Vans - Follow recommended maintenance schedules as outlined in manufacturers' maintenance/service manual.

2. General Maintenance Actions
   a. Replace thermostats every three- (3) years.
   b. Replace anti-freeze every three- (3) years. Never more than 50/50 mix.
   c. Change transmission fluid, filter and adjust bands every 50,000 miles.
   d. Replace:
      i. Spark plugs at 100,000 miles
      ii. Hydraulic filter (annually)
      iii. Fuel filter 15,000 miles

iv. Water filter (annually prior to winter season)

e. Add diesel fuel additive to fuel tanks according to directions on container every time a vehicle enters shop for repair.

f. Add gas treatment to fuel tanks according to directions on container every time vehicle enters shop for repair.

F. **Vehicle Cleaning Vehicles** shall be thoroughly and regularly cleaned in accordance with the schedules outlined below:

1. Cleaning - Monthly
   a. Remove gum deposits from flooring.
   b. Sweep floor with clean, dry broom.
   c. Remove graffiti as required.
   d. Wash or vacuum ceiling.
   e. Wash dome light assemblies using a soap and water solution.
   f. Wash all stanchions and handrails using a soap and water solution.
   g. Wash dash and drivers' console area using a soap and water solution.
   h. Wash ledges and walls using a soap and water solution.
   i. Clean all windows using window cleaner and a clean dry cloth.
   j. Clean all window ledges using a soap and water solution.
   k. Clean driver's area using a soap and water solution.
   l. Clean and deodorize wheel and stepwell areas.
   m. Completely mop and deodorize flooring.
   n. Complete interior clean checklist (Attached).
2. Cleaning - Bi-Weekly. Cleaning activities must be performed bi-weekly as part of the mini-inspection process as well as each time a van or sedan is on the lift for any maintenance activity. The scope of work for this cleaning is as follows:
   a. Wash dash and drivers console areas using a soap and water solution.
   b. Wash all ledges using a soap and water solution.
   c. Clean all windows using window cleaner and a clean dry cloth.
   d. Sweep the floor with a clean dry broom.
   e. Completely mop and deodorize flooring.
   f. Wash the outside of the vehicle thoroughly with a soap and water solution.
3. Cleaning - Daily
   a. Use a broom to sweep the bus floor clean, wipe seats and dash with a clean dry cloth

G. **Operator's Driver Qualifications** - Each Operator's driver's record and qualifications are subject to an initial and annual inspection by LogistiCare as well as interim inspections as required by LogistiCare in its sole discretion. LogistiCare reserves the right to disallow, for any reason, any Operator's driver from performing services under this Agreement. Any Operator's driver failing to meet all of the qualifications listed below, at any time, must be prohibited from providing service under this Agreement.

1. Each Operator's driver must be at least twenty one (21) years of age and must possess a valid Virginia, Maryland, or District of Columbia driver's license.
2. Operator's drivers must be able to speak, read, write English, and to make corrective changes on daily trip logs. Operator's drivers should have the ability to physically assist in loading and unloading of elderly and disabled passengers when necessary.

3. Operator's drivers must have a minimum of five (5) years driving experience; a thorough knowledge of traffic safety, an excellent driving record, and must be in good physical health. Operator's drivers must be able to deal effectively with the elderly, disabled and general public, have the ability to arrive at work on time, have favorable job history and satisfactory references, and have received a criminal records check within one year prior to beginning service under this Agreement.
4. LogistiCare shall provide, at LogistiCare expense, each Operator's driver, within 90 days of assignment to perform services under this Agreement, with training that includes at a minimum: vehicle orientation, defensive driving, accident and vehicle emergency procedures, basic first aid, map reading, fare structure and collection, schedule reading and completion, system familiarization, customer assistance, customer sensitivity training, and other such training as LogistiCare and WMATA may deem necessary. LogistiCare may accept Operator's training program as an alternative to the above.
5. On an annual basis, LogistiCare shall also provide a minimum of eight hours behind the wheel training for each driver, to be followed by a formal evaluation of driving skills lasting at least one hour.
6. Operator shall be responsible for ensuring attendance of drivers at required training. LogistiCare shall be responsible for training and training materials costs only, and will not be responsible for any other costs to the drivers or Operator associated with attending such training.
7. Each Operator's driver must be neat and clean in appearance.
8. Each Operator's driver and attendant must have no prior convictions for a substance abuse or sexual crime or a crime of violence. Any person convicted of a felony during the past five (5) years will drive and/or attend passengers only after satisfactory review by LogistiCare.
9. Operator shall not utilize Operator's drivers who are known abusers of alcohol or known consumers of narcotics or drugs/medications that would endanger the safety of MetroAccess eligibles. If Operator suspects an Operator's driver to be driving under the influence of alcohol, narcotics or drugs/medications that would endanger the safety of MetroAccess eligibles, Operator shall immediately remove the Operator's driver from providing service under this Agreement. Further, within six months of the execution of this Agreement, Operator shall perform urine screening for traces of illicit drugs for all Operator's drivers performing services hereunder on behalf of Operator.
10. Operator shall agree to comply with the requirements of LogistiCare's MetroAccess drug and alcohol testing program (attached) or must submit for LogistiCare approval, prior to initiating service under this Agreement, Operator's own testing program that complies with FTA regulations as set forth in 49 CFR, parts 40, 653, and 654.
11. Any individual who has had within the past five (5) years or currently has a suspended or revoked Operator's driver's license, commercial or other, is prohibited from driving for any purpose under this Agreement.
12. No Operator's driver may have any record of a moving violation within one year prior to service start.
13. Any Operator's driver who receives two (2) moving violations and/or accidents where the Operator's driver was at fault during any 12 month period during the effectiveness of this Agreement shall not be allowed to provide service under this Agreement.

**H. Driver Performance Requirements**

1. Drivers must exit their vehicle and offer assistance to every customer unless the driver has first hand knowledge that the customer does not require or will refuse assistance.

2. Drivers must assist customers within the vicinity of the vehicle. Drivers must provide assistance to customers who require help to be seated, including fastening and unfastening seat belts, wheelchair restraints and lap belts.
3. Drivers shall request customers to use seat and lap belts but shall not refuse service to any customer who chooses not to use these devices.
4. Drivers are required to carry up to 2 bags or parcels, weighing up to 40 pounds in total, including groceries, in and out of the vehicle for customers. Drivers shall help customers secure packages within vehicles. Drivers shall help customers secure portable oxygen bottles in the vehicle.
5. Drivers shall announce stops for customers. Drivers shall attempt to locate passengers upon arrival.
6. Drivers shall wear uniforms prescribed and provided by the carrier and approved by WMATA at all times that the driver is in service. The uniform shall consist of a light blue, gray, or white blouse or shirt with pocket, dark blue slacks or trouser, a dark baseball type cap (optional) and depending upon the season, a dark blue jacket and other dark blue outer garments. Shoes shall be black and serviceable having flat, non-skid soles. No high heels, tennis shoes or open sandals will be worn. Tee-shirts and shorts are prohibited.
7. No driver shall wear or display any insignia, patch, or emblem other than those supplied by the Operator and approved by LogistiCare. Each driver shall wear an identification badge supplied by the Operator to be worn on the driver's shirt, blouse or jacket in a manner visible to customers. The badge will contain both the Operator's and driver's name and the words MetroAccess.
8. Each driver must carry a timepiece accurate to within 15 seconds each day. Each driver is to verify the time with Operator dispatcher at least once each day, preferably prior to leaving the garage or during shift change.
9. Drivers shall remain constantly accessible for communication from Operator and LogistiCare dispatchers and shall at all times comply with dispatch instructions.
10. Drivers shall call in to dispatch every arrival and departure time from every pick-up and drop-off location, including pull-out and garage return times.
11. Drivers shall IMMEDIATELY report to Operator dispatch any service problems as they occur, including but not limited to: accidents, injuries, vehicle condition, manifest error, schedule adherence problems, customer no-show, traffic condition, customer behavior problem, excessive customer assistance requirement, customer identification problem, fare payment problem, and any other clarification required on the part of the driver.
12. Drivers will ACCURATELY and LEGIBLY record on the daily vehicle manifest the time and mileage of all vehicle pull-outs and pull-ins and all customer pickups and drop-offs. Driver shall correctly employ any Mobile Data Terminal technology installed in the vehicle.
13. Drivers shall be required to fulfill the daily vehicle manifest, carrying out each pick-up, drop-off and other stop in the sequence given. Unauthorized deviation from the schedule sequence by the driver is sufficient grounds to remove the driver from services.
14. Drivers shall assist customers unable to sign the trip manifest by signing for them and noting on the manifest that the driver has done so. Every customer will be requested to sign the manifest before signing for them. Trip information should be completed prior to the passenger's signature request.
15. In the event that a driver cannot locate a customer upon arrival, the driver will immediately radio Operator dispatch for assistance. The Operator dispatcher will attempt by telephone to

locate the customer and will provide further instructions to the driver. The driver will not leave the pick up location until authorized to do so by the Operator dispatcher. Prior to leaving the pick up location the driver shall note the no-show and the time of departure and the authorizing dispatcher's name on the trip ticket and driver manifest.

16. The driver shall make reasonable provision for a customer when the driver knows that the customer is on the way to the vehicle.
17. Drivers will immediately notify Operator dispatch whenever they are aware that they will be more than 15 minutes late for a pickup.
18. Drivers are required to be knowledgeable about the Paratransit fare tariff adopted by WMATA and any changes in the fare tariff communicated by LogistiCare to the Operator. Drivers shall use interior lighting of the vehicle at night to provide for a safe customer egress from the vehicle.
19. Drivers shall not drop off customers into the path of traffic.
20. Drivers shall operate heating and air conditioning systems so as to provide for the comfort of customers. The driver is not authorized to open windows for ventilation in lieu of air conditioning unless vehicle air conditioning systems have failed.
21. Drivers shall keep confidential any information that the driver may have about the medical or other condition of the customer except as to perform the necessary work related to his or her position. The driver can report medical information to authorized medical assistance personnel who report to the scene of an accident or to the scene of any medical emergency.
22. Drivers are prohibited from soliciting, accepting or in any way encouraging payment of a tip, gratuity, additional payment or any service from any customer at any time. Engaging in such conduct is grounds for immediate removal from services.
23. Drivers shall at all times be courteous to customers. Although it is expected that abusive customers will be an exception, in the event of an abusive customer, drivers shall at all times comport themselves as they have been trained to do in the sensitivity training.
24. Drivers are not required to provide personal care attendant service to any customer who cannot travel unattended. In the event that a customer needs but does not have personal care attendant service, the driver shall immediately notify the LogistiCare dispatcher for instruction. The driver shall not leave any passenger in a situation where it is dangerous to the customer.
25. In the event of medical emergency, the driver shall immediately pull his vehicle out of traffic and notify dispatch of the emergency. This driver shall provide any assistance reasonably required and as documented in training provided by the LogistiCare. The driver shall stay with the customer until emergency assistance arrives.
26. In the event that any customer engages in any illegal act, or in a manner that is unsafe to the customer or any other customer, or strikes or otherwise abuses the driver or any other customer, the driver shall, at the earliest safe moment, report the incident to LogistiCare.
27. Drivers shall operate vehicle lifts from outside of the vehicle using a remote device operated via pigtail or other device. Drivers shall provide assistance to customers using adaptive devices in entering and exiting the lift platform and the vehicle.
28. Drivers are prohibited from entering buildings and from providing assistance to persons attempting to navigate more than one step.
29. Drivers shall refrain from eating, drinking, smoking or using headphones at any time while operating the vehicle or while passengers are in the vehicle.
30. Drivers shall observe and shall require customers to observe rules of carriage to include: no smoking; no drinking of alcoholic beverages; no standing while vehicle is in motion; no person

will put a wheelchair in motion, occupied or unoccupied while the vehicle is moving; no person other than the driver will be allowed to operate the vehicle or the vehicle's two way radio, lift or ramp device; no person will be allowed to operate a radio that can be heard by other customers or any television set.

31. For the safety of customers, drivers are not required to assist customers more than 100 feet from the vehicle or to provide assistance that would require the driver to lose sight of the revenue vehicle. Drivers are required to stay within sight of the vehicle at all times.
32. For the safety of customers and the driver, customers are also prohibited from, spitting, playing of music unless through headphones, and consuming alcoholic beverages in vehicles. The driver shall, at the earliest safe moment, report any incidents to the dispatcher. Drinking of non-alcoholic beverages is allowed. This last provision is made for certain disabilities, which require either fluid replenishment or intake of sugars.
33. Customers boarding in three wheeled scooters may be requested but cannot be required to transfer to a seat. Drivers are required to help in the transfer if the transfer can be made without lifting or carrying the customer. Drivers will help secure infant seats brought by customers.

## I. Insurance, Licensure, and Certification

1. Operator represents that it is currently registered with either the Maryland Public Service Commission (MPSC), or the Washington Metropolitan Area Transit Commission (WMATC) to provide transportation (as required in accordance with all laws governing such registration and certification). Operator shall maintain such registration and certification throughout the term of this contract and produce evidence of same to LogistiCare within three days upon request.
2. Operator represents that it has never been terminated from participation in any MetroAccess program or been determined to have committed MetroAccess fraud.
3. Operator shall maintain all other licensure and certification required by federal, state, county and local governments.
4. Operator shall purchase and maintain at a minimum the following levels of insurance throughout the term of the Agreement and submit evidence of same to LogistiCare upon signing this Agreement:

| | |
|---|---|
| Vehicle Liability Coverage: | $1,000,000 combined single limit |
| Commercial General Liability Coverage: | $1,000,000 per occurrence |
| Umbrella Liability: | $4,000,000 per occurrence |
| Worker's Compensation: | Statutory |
| Employer's Liability: | $500,000 each accident |
| | $500,000 disease policy limit |
| | $500,000 disease each employee |

5. All insurance coverage shall name LogistiCare as "Additional Insured" and shall be primary with respect to claims and co-insurance determinations. Insurance policies shall indicate that LogistiCare will be informed in writing at least 30 days prior to notice of any termination of insurance coverage. The Operator shall provide LogistiCare with original certificates of insurance listing LogistiCare as "Certificate Holder" within 10 days of the execution of this Agreement.

6. Operator shall indemnify, protect, and hold LogistiCare and WMATA harmless from and against any and all claims, actions, suits, proceedings, costs, damages, injuries, and/or liabilities of any kind or nature whatsoever arising from or alleged to arise from actions connected with services provided by or at the direction of Operator, including the cost of reasonable attorney fees and other expenses incurred by or assessed against LogistiCare or WMATA. Operator shall operate as an independent Operator in providing services under this Agreement, and not as an agent, representative, or employee of LogistiCare.

7. Operator agrees to defend all suits brought against it in relation to the performance of services under this agreement, and pay all costs and expenses incidental thereto. However, LogistiCare shall have the right at its own expense to participate in the defense of any suit without relieving the Operator of any obligation thereunder;

**J. Maintenance of Records**

1. Operator must establish, maintain and provide within 24 hour notice upon request by LogistiCare or WMATA, or as required under this Agreement, the following records and related information:

   a. Copy of Operator's registration with WMATC.

   b. Vehicle records, including at a minimum the following documentation for each vehicle:

      i. manufacturer and model;
      ii. model year;
      iii. vehicle identification number;
      iv. odometer reading at the time the vehicle enters service under this agreement;
      v. type of vehicle (minibus, wheelchair van, stretcher van);
      vi. capacity (number of passengers);
      vii. license tag number;
      viii. insurance certifications;
      ix. (deleted)
      x. special equipment (lift, etc.);

   c. Operator's driver records, including at a minimum the following documentation for each Operator's driver:
      i. name, date of birth and social security number;
      ii. copy of the Operator's driver's license;
      iii. prior driving record for previous three years obtained from;
      iv. documentation of any complaints received about the Operator's driver and any accidents or moving violations involving the Operator's driver.

   d. Any other records LogistiCare is required to collect from Operator pursuant to its WMATA contract, including, but not limited to, maintenance records, drug testing records, driver training records, etc.

   e. Operator shall inform LogistiCare not later than the one hour from the time of any accident involving Operator's dedicated vehicle transporting MetroAccess eligibles, or any other incident resulting in injury to MetroAccess eligibles, or any potential liability involving MetroAccess eligibles transported, or any moving violation involving a dedicated vehicle. If LogistiCare offices are closed, Operator should inform LogistiCare by 9:00 AM on the following workday. A copy of the investigating officer's accident report and any related citations should be forwarded to LogistiCare within 24 hours from the date of the incident.

   f. The Operator shall file a written report with LogistiCare within 1 working day of the

accident or moving violation and shall cooperate with LogistiCare and the MetroAccess during any ensuing investigation.

## K. Liquidated Damages

The Parties agree that the failure of Operator to perform services in conformance with this Agreement may cause LogistiCare to be damaged in amounts that will be difficult or impossible to determine. Therefore, the Parties have agreed that the sums set forth below are reasonable as liquidated damages for the specified occurrences. It is further understood and agreed that the liquidated damages specified below are in lieu of actual damages for such occurrences. Operator hereby waives any defense as to the validity of such liquidated damages on the grounds that they are void as penalties or are not reasonably related to actual damages. LogistiCare shall make every effort to inform Operator in advance of service deficiencies that may subject Operator to liquidated damages.

Operator shall pay to LogistiCare on demand for each such failure the liquidated damages as set forth below.

1. **Operator's Obligation:**
   Provide reports and records as required under this Agreement. Such reports and records include, but are not limited to, daily pullout and inspection forms, maintenance records, reconciliation data, complaint investigation reports, radio assignments, etc.

   **Liquidated Damages:**

   $100 per working day or any part thereof for each day each report or other deliverable is late or unacceptable.

2. **Operator's Obligation:**
   Maintain all vehicles utilized under this Agreement up to all vehicle manufacturer and state and federal safety standards, ,the Americans with Disabilities Act ("ADA"), and the terms of this Agreement. Any vehicle found non-compliant with safety standards, PSC or ADA regulations, or the terms of this Agreement must be removed from service immediately upon discovery.

   **Liquidated Damages:**

   $100 per calendar day or any partial day that non-compliant vehicle is in service from the date of discovery.

3. **Operator's Obligation:**
   Any Operator's driver who is found not to be in compliance with the terms of this Agreement must be immediately removed from driving under this contract.

   **Liquidated Damages:**

   $100 per calendar day or any part thereof in which a Operator's driver is non-compliant with terms of this Agreement is allowed to drive under this Agreement.

4. **Operator's Obligation:**
   Operator must meet all pullout obligations, must not refuse routed work, and must notify LogistiCare immediately of inability to perform assigned trips.

   **Liquidated Damages:**

   $100 per vehicle per day for missed pullouts. $50 per trip for any work refused or re-routed without LogistiCare permission.

5. **Operator's Obligation:**
Operator must perform transportation services with the class of service (ambulatory, wheelchair, or sedan only ) requested by LogistiCare.

   **Liquidated Damages:**

   $200 per occurrence where a vehicle is utilized that is of a class of service lower than that requested.

6. **Operator's Obligation:**
Operator must assure that MetroAccess eligibles are picked up within 15 minutes of the schedule pick-up time

   **Liquidated Damages:**

   $ 50 per occurrence where a vehicle is greater (>) than 15 minutes but (<) less than 30 minutes
   $ 75 per occurrence where a vehicle is greater (>) than 31 minutes but (<) less than 60 minutes
   $100 per occurrence where a vehicle is greater (>) than 61 minutes but (<) less than 90 minutes
   $150 per occurrence where a vehicle is greater (>) than 91 minutes but (<) less than 120 min.
   $250 per occurrence where a vehicle is greater (>) than 121 minutes

7. **Operator's Obligation:**
Operator must provide written termination notice within the terms of this Agreement.

   **Liquidated Damages:**

   $1,000 for every day in which fails to comply with written notice requirements. Failure to provide written termination notice in compliance with this Agreement may also result in the forfeiture of any outstanding amounts due to Operator.

8. **Operator's Obligation:**
Operator must only invoice LogistiCare for trips actually performed in conformance with this Agreement.

   **Liquidated Damages:**
   $500 per occurrence of fraudulent billing.

9. **Operator's Obligation:**
Operator must not incur more than 1 verified (by LogistiCare) complaints per 1,000 scheduled trips per month.

   **Liquidated Damages:**
   $100 for every verified complaint over 1 per 1,000 trips.

10. **Operator's Obligation:**
Operator and its drivers must immediately inform LogistiCare of all no-shows and late trips.

    **Liquidated Damages**
    $50 for each failure to inform LogistiCare immediately of a rider no-show or a late running trip.

11. **Operator's Obligation**
Operator must conform to vehicle cleaning standards as outlined in the Agreement.

**Liquidated Damages:**
$100 for any vehicle found to be non-compliant with the vehicle cleaning standards

12. **Operator's Obligation**
Operator must conform to vehicle maintenance standards as outlined in the Agreement.

**Liquidated Damages**
$100 for any vehicle found to be non-compliant with the vehicle maintenance standards

**Any liquidated damages assessed against Operator will be deducted from amounts due to Operator.**

LOGISTICARE SOLUTIONS, LLC

[signature]

By: Albert Caetano

CEO 11/16/05
*(printed name, title)*

MV TRANSPORTATION, INC.

[signature]

By: Jon Monson

*Chief Executive Officer*

EXHIBIT B

MetroAccess Transportation Services Agreement
Rates, Invoicing, Payment Terms, and Coverage Area

Rates
Only services specifically pre-authorized by LogistiCare will be compensated. Pricing for transportation performed by Operator under the Agreement shall be as follows:

| Class of Services | |
|---|---|
| Ambulatory | $ 24.00 per trip with $1.50 for every mile over 10 miles |
| Wheelchair | $ 26.00 per trip with $1.50 for every mile over 10 miles |
| Shared Ride Fee | $10 per each "PCA", "Companion" and "Under 5" authorized passenger |

Each "trip" is one-way. "Round trips" count as two trips. Trip pricing includes MetroAccess co-payments required to be collected by Operator. Each MetroAccess-eligible rider in a vehicle counts as the original trip and the "PCA", "Companion" and "Under 5" should be billed and paid as a Shared Ride Fee. These rates become effective upon execution of the Agreement.

Invoicing
As a condition of payment, by 10:30 of the day following each day of service, Operator shall submit to LogistiCare all completed trip logs from the previous day signed by the appropriate ADA eligible rider. Trip logs improperly completed will be returned to Operator for correction and are not eligible for payment. Included with each batch of trip logs, Operator shall submit a summary invoice indicating performance information.

Payment Terms
LOGISTICARE will pay invoices by check or electronic transfer on the First and Fifteenth day each month. . To the extent that the First or Fifteenth day of any month falls on a weekend or holiday, payments will be made on the next succeeding working weekday. Payments made on the First and Fifteenth day of each month will be made for all outstanding uncontested invoiced amounts properly **submitted twenty-eight days or more prior** to the payment date. Operator's final payment is subject to receipt from WMATA of all amounts due to LogistiCare.

In the event of a dispute with respect to amounts owed to Operator, Operator shall provide supporting invoice documentation. After LOGISTICARE reviews the documentation to verify charges, and should a discrepancy continue to exist, LOGISTICARE will pay the uncontested portion and work with Operator to reconcile any differences. Operator shall continue to perform its obligations hereunder irrespective of any outstanding contested amounts.

Operator agrees that LOGISTICARE, in LOGISTICARE's sole discretion, (1) may reduce by 10% (Ten Percent) the amounts due under any invoice which is not properly

presented complete with vehicle manifest documentation within Fourteen days of date of service and (2) may disallow all amounts due for any services provided which are not properly invoiced complete with trip-ticket documentation within Fourteen days of date of service and (3) may reduce the amounts due under any invoice for operating expenses incurred on behalf of the transportation provider in operating their vehicles, this may include maintenance cost incurred by LOGISTICARE and mandated for dedicated vehicles under the preventive maintenance program. Such operating costs may include vehicle fines, radio and wireless communication expense and any other agreed upon item for which the Operator is responsible for.

Upon termination of service agreement by Operator, failure to provide written termination notice in compliance with this Agreement will result in the forfeiture of any outstanding amounts due to Operator.

Coverage Area and Operating Hours

Operator shall operate during all hours of MetroAccess service, as described in Exhibit A of this contract. Operator shall accept any trips originating or terminating in its designated coverage areas, as well as other trips reasonably routed along with such trips. Coverage area and operating hours may be amended from time to time with the mutual consent of Operator and LogistiCare.

Coverage area is: ______________________.

LOGISTICARE SOLUTIONS, LLC

LogistiCare Solutions, LLC

Albert Cortina

By: [signature]

Albert Cortina, COO

*(printed name, title)*

Date: 11-10-05

MV Transportation Inc.

By: [signature]

Jon Monson CEO

*(printed name, title)*

Date: 11-9-05

# WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION

## CONTRACT TARIFF COVER

For Commission Use Only.

Filing Fee Paid $ ____

Date Filed plus 60 days ____

Contract Tariff No. CT- 3

Amendment Letter ____

Date Filed at WMATC 11-22-05

Date Effective 11-17-05

Expiration Date 1-28-06

NOTE: SEE COMMISSION REGULATION Nos. 55 AND 56. If you have a question about how to complete this form, call the Commission at (202) 331-1671

1. Carrier's WMATC Certificate of Authority No. 764
2. Carrier's Name (as on Certificate of Authority): MV Transportation, Inc.

   Carrier's Address: 6500 Ammendale Road
   Beltsville, MD 20705

   Telephone Number 301-562-4745
3. Person authorized to file tariff on behalf of Carrier:

   Name Jon Monson

   Title Chief Executive Officer

   Telephone Number 707-372-2909
4. This tariff covers operations pursuant to a contract between the above-named carrier and (Name): Logisticare Solutions, LLC.

   Address: 1640 Phoenix Blvd Suite 200
   College Park GA 30349

   Name of Representative Albert Cortina

   Telephone Number of Representative: 800-486-7647
5. Date this tariff actually filed with WMATC 11-22-05
6. Date seven (7) calendar days after date on Line 5. 11-29-05
7. First Date passenger transportation service is required under this contract. 11-24-05
8. Enter later date from Line 6 or 7 11-29-05 This is the EFFECTIVE DATE of this tariff.
9. Expiration date of contract (at least 60 days after date on line 8). 1-28-06
10. I hereby certify that this contract requires the performance of passenger transportation service at least on the dates specified on Line 8 and Line 9.

[signature]

Signature of Person Named on Line 3